## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

ALTERNATIVE MATERIALS, LLC,

      Plaintiff,

v.                                                    Case No. 5:20-cv-239-AW/MJF

TIMOTHY W. MONROE, *et al.*,

      Defendants.

_____/

## **REPORT AND RECOMMENDATION**

After TCH Construction Group, Inc. ("TCH"), failed to install a building for Plaintiff Alternative Materials ("AM"), AM initiated this action against TCH, TRM Transporting, LLC ("TRM"), and Timothy W. Monroe. AM asserts claims of breach of contract, unjust enrichment, and fraud against TCH and Monroe, and claims of breach of contract and unjust enrichment against TRM. AM has moved for summary judgment only as to its claims against Monroe. Doc. 54. Monroe did not respond, despite the undersigned inviting him to do so. Doc. 55. Because there is at least one genuine issue of material fact as to each of AM's claims, the District Court should deny AM's motion for summary judgment.

# I. BACKGROUND

AM mines and processes limestone in Marianna, Florida. On June 8, 2020, Scott Haire, the managing member of AM, signed and accepted a "formal proposal" from TCH, a corporation of which Monroe is the chief executive officer. Doc. 54-3 at 2 ¶ 9; *id.* at 8-9. Under the contract, AM agreed to pay TCH $1,540,000 to install a building at AM's quarry in Marianna for AM to store limestone. *Id.* at 3 ¶ 10; *id.* at 8-9. The contract contained a construction timeline:

1.    installation of footers would take approximately three to four weeks;

2.    TCH would pick up the building the third week of July, "worst case August 1st"; and

3.    TCH would complete the installation by August 15, 2020, or "worst case scenario September 1st for any unforeseen delays."

Doc. 54-3 at 2 ¶¶ 7-9; *id.* at 8-9; Doc. 54-4 at 2 ¶ 7. TRM agreed to deliver the building to the quarry. Doc. 54-3 at 8.

The contract also contained a payment schedule under which AM agree to pay TCH:

1.    10% of the total price within ten days of accepting the formal proposal;

2.    50% of the total price within ten days of TCH arriving at the project site; and

3.    40% of the total price within thirty days of TCH completing the project.

*Id.*

On June 18, 2020, the parties agreed to modify the building's dimensions. *Id.* at 3 ¶ 10. Instead of installing a "200 feet by 400 feet building," TCH agreed to install a "200 feet by 300 feet 'clear span' building." *Id.*; Doc. 54-4 at 2 ¶ 8. Four days later, on June 22, 2020, AM paid $154,000 to TCH, which represented AM's first payment under the contract. Doc. 54-3 at 3 ¶ 11; Doc. 54-4 at 2 ¶ 9. Monroe stated that a portion of the $154,000 payment would be paid to Akers Building Systems, Inc. ("Akers"), the entity fabricating the building. Doc. 54-3 at 3 ¶ 11.

On July 1, 2020, the parties met at the project site for an on-site inspection. *Id.* ¶ 13; Doc. 54-4 at 3 ¶ 10. During the inspection, the parties agreed to modify the payment schedule because, according to Monroe, Akers required an additional payment of $150,000. Doc. 54-3 at 3 ¶ 13; Doc. 54-4 at 3 ¶ 10. Under the modified payment schedule, AM agreed to pay TCH:

1.    $150,000 as an additional down payment for Akers;

2.    $450,000 upon completion of the footers; and

3.    $786,000, the remaining balance, upon the project's completion.

Doc. 4 at 8 ¶ 31; Doc. 54-3 at 3 ¶ 13; Doc. 54-4 at 3 ¶ 10.

On July 8, 2020, AM paid $150,000 to TCH under the modified payment schedule, and Monroe represented that the entire $150,000 payment was paid to

Akers.[1] Doc. 54-3 at 3-4 ¶¶ 14-15; Doc. 54-4 at 3 ¶ 12. The next day, on July 9, 2020, TCH made a $110,000 payment to Akers, and on July 16, 2020, Akers ordered the building's fabrication. Doc. 54-2 at 5, 7, 11.

During July 2020, Haire noticed that TCH "was not making progress toward construction," and on several occasions Haire expressed his concerns to Monroe. Doc. 54-3 at 4 ¶ 16; *see* Doc. 54-4 at 3 ¶ 13. Monroe reassured Haire that TCH would be able to meet the construction timeline set forth in the contract. Doc. 54-3 at 4 ¶¶ 17; Doc. 54-4 at 4 ¶ 14.

At some point in July 2020, Monroe asked Haire to make a $450,000 payment, which was outside of the modified payment schedule. Doc. 54-3 at 4 ¶ 18; Doc. 54-4 at 4 ¶ 16. Haire refused because TCH still had not poured the footers. Doc. 54-3 at 4 ¶ 18.

After Haire again questioned TCH's lack of progress, Monroe sent Haire an invoice showing that TCH had ordered the modified building from Akers. *Id.* at 4-5 ¶ 20; Doc. 54-2 at 10-11. The invoice Monroe provided reflected a payment amount of $150,000. Doc. 54-3 at 4-5 ¶ 20; Doc. 54-2 at 10. According to AM, this invoice contradicted Monroe's previous assertion that part of the first payment of $154,000 had been used for the building's down payment. Doc. 54-3 at 5 ¶ 21. Furthermore,

---

[1] After the $150,000 payment, AM's payments to TCH totaled $304,000.

AM learned that the building's down payment was $110,000, not $150,000 as represented in the invoice that Monroe provided. Doc. 54-2 at 3 lines 3-15; *id.* at 5 lines 2-11; *compare* Doc. 54-2 at 10, *with id.* at 11.

Sometime in August 2020, AM terminated the project, and on August 4, 2020, TCH canceled the building's fabrication. Doc. 54-2 at 8-9; Doc. 54-3 at 5 ¶ 24; Doc. 54-4 at 4 ¶ 19.

On September 9, 2020, AM initiated this action against Monroe, TCH, TRM, and Akers.[2] Doc. 1. On October 2, 2020, AM filed an amended complaint. Doc. 4. Relevant to AM's motion for summary judgment, AM asserted in its amended complaint five claims against Monroe: (1) breach of contract; (2) unjust enrichment; (3) fraud in the inducement; (4) fraudulent misrepresentation; and (5) fraud. *Id.* at 12-13, 14-20. On February 17, 2022, AM moved for summary judgment on all claims against Monroe. Doc. 54.

## II. STANDARD

A court must grant summary judgment if a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" dispute exists "if the evidence is

---

[2] On May 19, 2021, AM and Akers filed a joint stipulation of voluntary dismissal under Federal Rule of Civil Procedure 41(a)(1)(A)(ii), dismissing with prejudice AM's claims against Akers. Doc. 28.

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1317 (11th Cir. 2021). An issue of fact is "material" if it could affect the outcome of the case. *Anderson*, 477 U.S. at 248; *Baas v. Fewless*, 886 F.3d 1088, 1091 (11th Cir. 2018). If the moving party "adequately supports its motion, the burden shifts to the nonmoving party to show that specific facts exist that raise a genuine issue for trial." *James River Ins. Co. v. Ultratec Special Effects Inc.*, 22 F.4th 1246, 1251 (11th Cir. 2022) (citation omitted). Summary judgment is appropriate when the nonmoving party's "evidence is 'not significantly probative.'" *Id.* (quoting *Anderson*, 477 U.S. at 249-50).

At the summary-judgment stage, a court "may not weigh conflicting evidence or make credibility determinations of [its] own." *Buending v. Town of Redington Beach*, 10 F.4th 1125, 1130 (11th Cir. 2021) (quotation omitted). Instead, the court's role is to "determine whether there is a genuine issue for trial." *Anderson*, 477 U.S at 249. All "justifiable inferences" must be resolved in the nonmoving party's favor so long as there is a genuine dispute as to those facts. *Beard v. Banks*, 548 U.S. 521, 529 (2006). "Conclusory allegations and speculation are insufficient to create a genuine issue of material fact." *Glasscox v. City of Argo*, 903 F.3d 1207, 1213 (11th Cir. 2018) (citing *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005)).

## III. DISCUSSION

**A.   <u>Applicable Law</u>**

Because this action was brought pursuant to the District Court's diversity-of-citizenship jurisdiction, the undersigned first must determine which state's law governs the claims on which AM requests summary judgment. AM filed this action in the Northern District of Florida, so the undersigned applies Florida's conflict-of-laws rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (noting that a federal court must apply the forum state's conflict-of-laws rules); *Fioretti v. Mass. Gen. Life Ins. Co.*, 53 F.3d 1228, 1235 (11th Cir. 1995) (same).

### 1.   *Contract-Related Claims*

In breach-of-contract actions, Florida courts apply the *lex loci contractus* rule. This rule looks to the place where the contract was executed for choice-of-law determinations regarding issues of contract law. *Prime Ins. Syndicate v. B.J. Handley Trucking, Inc.*, 363 F.3d 1089, 1091 n.1 (11th Cir. 2004) (quoting *Lumbermens Mut. Cas. Co. v. August*, 530 So. 2d 293, 295 (Fla. 1988)). Such issues include "matters bearing on the validity and substantive obligation of contracts." *Tang How v. Edward J. Gerrits, Inc.*, 961 F.2d 174, 179 (11th Cir. 1992). The *lex loci contractus* rule also applies to claims of unjust enrichment. *See Trumpet Vine Invs., N.V. v. Union Cap. Partners I, Inc.*, 92 F.3d 1110, 1119 (11th Cir. 1996).

"The determination of where a contract was executed is fact-intensive, and requires a determination of 'where the last act necessary to complete the contract [wa]s done.'" *Prime Ins. Syndicate*, 363 F.3d at 1092-93 (citation omitted). Under Florida law, the "last act necessary to complete a contract is the offeree's communication of acceptance to the offeror." *Id.* at 1093 (citing *Buell v. State*, 704 So. 2d 552, 555 (Fla. Dist. Ct. App. 1997)). An acceptance "is operative and completes the contract as soon as put out of the offeree's possession, without regard to whether it ever reaches the offeror, unless the offer otherwise provides." *Kendel v. Pontious*, 261 So. 2d 167, 169 (Fla. 1972) (citation omitted).

AM argues that Florida law governs its breach-of-contract and unjust-enrichment claims for two reasons. First, Haire accepted the formal proposal through his agents in Florida. Doc. 58 at 3-4. Second, AM asserts that the parties modified the contract in Florida. *Id.* at 4. Monroe does not dispute these allegations. Because it appears that TCH's offer was accepted in and subsequent modifications were made in Florida, the undersigned applies Florida law to AM's contract-related claims.

## 2. *Fraud-Related Claims*

In tort actions, Florida courts apply the significant-relationship test. *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 694 (11th Cir. 2016) (quotation omitted); *Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007); *Mezroub v. Capella*, 702 So. 2d 562, 564 (Fla. Dist. Ct. App. 1997). A

modified version of the significant-relationship test applies, however, to claims involving fraud or misrepresentation "[w]hen the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made." Restatement (Second) of Conflict of Laws § 148(2) (AM. L. INST. 1971); *Trump Vine Invs., N.V.*, 92 F.3d at 1118; *OJ Com., LLC v. Ashley Furniture Indus.*, 359 F. Supp. 3d 1163, 1171 n.5 (S.D. Fla. 2018).

Under the modified version, courts look to six factors:

1.  the place, or places, where the plaintiff acted in reliance upon the defendant's representations;

2.  the place where the plaintiff received the representations;

3.  the place where the defendant made the representations;

4.  the domicile, residence, nationality, place of incorporation and place of business of the parties;

5.  the place where a tangible thing that is the subject of the transaction between the parties was situated at the time; and

6.  the place where the plaintiff is to render performance under a contract that he has been induced to enter by the false representations of the defendant.

*Trump Vine Invs., N.V.*, 92 F.3d at 1118 (citing Restatement (Second) of Conflict of Laws § 148(2)(a)-(f)).

AM asserts that Florida law governs its fraud-related claims for several reasons: (1) AM's injuries occurred at its quarry in Florida; (2) at least some of Monroe's alleged misrepresentations occurred at the parties' meeting in Florida; (3) AM maintains a place of business in Florida; (4) AM's quarry in Florida is the center of the parties' contractual relationship; and (5) the contract was to be performed in Florida. Doc. 58 at 5-9; Doc. 58-1 at 4, 6; Doc. 58-2 at 2-4. These facts suggest that Florida law governs AM's fraud-related claims.

Admittedly a few facts weigh against applying Florida law. For example, Monroe sent the formal proposal from North Carolina and, therefore, some of Monroe's alleged misrepresentations were made in North Carolina. Defendants are domiciled in, are incorporated in, or maintain a place of business in North Carolina. Doc. 4 at 4 ¶¶ 10-12. Individual members of AM are citizens of Texas and Pennsylvania, and its entity member, a limited liability company, consists of members who are citizens of Texas. *Id.* ¶ 9. Nevertheless, the totality of the relevant factors weighs more heavily in favor of applying Florida law to AM's fraud-related claims. The undersigned, therefore, applies Florida law to these claims.

## B.    <u>Contract-Related Claims</u>

AM moves for summary judgment on its breach-of-contract claim or, alternatively, on its unjust-enrichment claim. Doc. 54 at 8-12, 31-33.

1.   ***Breach-of-Contract Claim***

Under Florida law, a breach-of-contract claim has three elements: "(1) a valid contract; (2) a material breach; and (3) damages." *Friedman v. N.Y. Life Ins. Co.*, 985 So. 2d 56, 58 (Fla. Dist. Ct. App. 2008) (citing *J.J. Gumberg Co. v. Janis Servs., Inc.*, 847 So. 2d 1048, 1049 (Fla. Dist. Ct. App. 2003)). As to the first element—the existence of a valid contract—"a person who signs a contract only in a corporate capacity is not bound as an agent" under the contract.[3] *Johnson v. Pires*, 968 So. 2d 700, 702 (Fla. Dist. Ct. App. 2007) (citing *Charter Air Ctr., Inc. v. Miller*, 348 So. 2d 614, 616-17 (Fla. Dist. Ct. App. 1977)); *Ryan v. Wren*, 413 So. 2d 1223, 1224 (Fla. Dist. Ct. App. 1982). That is because "a corporation is a separate legal entity, distinct from the persons" composing the corporation. *Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. Dist. Ct. App. 2008) (citation omitted). Thus, there is no valid contract with a person who enters a contract only as an officer or representative of a corporation. *Johnson*, 968 So. 2d at 702; *Spears v. SHK Consulting & Dev., Inc.*, 338 F. Supp. 3d 1272, 1278 (M.D. Fla. 2018).

AM asserts that it contracted with Monroe and, therefore, it has a valid contract with Monroe. Doc. 54 at 3, 13; Doc. 54-3 at 2 ¶¶ 7, 9. At least four pieces

---

[3] The "piercing the corporate veil" theory provides an exception to this rule. *Flooring Depot FTL, Inc. v. Wurtzebach*, 330 So. 3d 47, 49 (Fla. Dist. Ct. App. 2021). AM, however, has not made this argument in its motion for summary judgment.

of evidence undermine this assertion. First, Monroe's name does not even appear in the formal proposal, which became the contract once AM accepted it. Doc. 54-3 at 8-9. Second, the formal proposal details TCH's obligations under the contract, not Monroe's obligations. *Id.* Third, the Akers invoice reflects that TCH purchased the building—not Monroe—and that Monroe only served as the primary contact for TCH. Doc. 54-2 at 10-11. Fourth, AM paid $304,000 to TCH, not to Monroe. Doc. 54-5 at 2-3.

Because there is a genuine issue of material fact—whether Monroe is individually liable under the contract—AM has not demonstrated that it is entitled to judgment as a matter of law. The District Court, therefore, should deny AM's motion for summary judgment as to its breach-of-contract claim against Monroe.

### 2.    *Unjust-Enrichment Claim*

Under Florida law, an unjust-enrichment claim has three elements:

1.    the plaintiff has conferred a benefit on the defendant,

2.    the defendant voluntarily accepted and retained that benefit, and

3.    the circumstances are such that it would be inequitable for the defendants to retain it without paying the value thereof.

*Omnipol, A.S. v. Multinat'l Def. Servs., LLC*, 32 F.4th 1298, 1308 (11th Cir. 2022) (citing *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1337 (11th Cir. 2012)); *Pincus v. Am. Traffic Sols., Inc.*, 333 So. 3d 1095, 1097 (Fla. 2022). A plaintiff cannot

pursue a claim of unjust enrichment, however, "if an express contract exists." *F.H. Paschen, S.N. Nielsen & Assocs. LLC v. B&B Site Dev., Inc.*, 311 So. 3d 39, 49 (Fla. Dist. Ct. App. 2021); *State Farm Fire & Cas. Co. v. Silver Star Health & Rehab*, 739 F.3d 579, 584 (11th Cir. 2013).

As noted above, AM is not entitled to summary judgment as to its breach-of-contract claim because there is a genuine issue as to whether Monroe is individually liable under the contract. For that same reason, summary judgment is inappropriate as to AM's unjust-enrichment claim against Monroe. *Goeree v. Mirtsou*, 923 So. 2d 610, 611-12 (Fla. Dist. Ct. App. 2006) (denying summary judgment as to an unjust-enrichment claim because there remained an issue of material fact as to whether the defendant was acting in his corporate capacity).

In his sworn declaration, Haire stated that he, on behalf of AM, contracted with Monroe. Doc. 54-3 at 2 ¶¶ 7, 9. Additionally, although Monroe in his deposition testified that "we were under contract," it is unclear whether the "we" to which Monroe referred meant "TCH," "TRM," "Monroe," or some combination of the three. His statement simply is ambiguous on this point. Doc. 54-1 at 6 lines 1-6.

If Monroe were in fact individually liable under the contract, then AM's unjust-enrichment claim necessarily would fail because, as discussed above, a plaintiff cannot pursue an unjust-enrichment claim against a party to "an express contract." *F.H. Paschen, S.N. Nielsen & Assocs. LLC*, 311 So. 3d at 49; *State Farm*

*Fire & Cas. Co.*, 739 F.3d at 584. Because there is a genuine issue as to whether Monroe is individually liable under the contract, AM has not shown that it is entitled to judgment as a matter of law. The District Court, therefore, should deny AM's motion for summary judgment as to its unjust-enrichment claim against Monroe.

## C.    **Fraud-Related Claims**

AM also moves for summary judgment against Monroe on AM's claims of fraud in the inducement, fraudulent misrepresentation, and fraud. Doc. 54 at 15-31.

### 1.    *Fraud-in-the-Inducement Claim*

A fraud-in-the-inducement claim has four elements:

1.    the defendant misrepresented a material fact;

2.    the defendant knew or should have known the falsity of the statement;

3.    the defendant intended that the representation would induce the plaintiff to enter into a contract or business relationship; and

4.    the plaintiff suffered injury in reliance on the misrepresentation.

*PVC Windoors, Inc. v. Babbitbay Beach Const., N.V.*, 598 F.3d 802, 808-09 (11th Cir. 2010) (quoting *Thompkins v. Lil' Joe Recs., Inc.*, 476 F.3d 1294, 1315 (11th Cir. 2007)).

For a viable fraud-in-the-inducement claim, the false statement or omission of material fact generally must pertain to "a past or existing fact, not a promise to do something in the future." *Bailey v. Covington*, 317 So. 3d 1223, 1228 (Fla. Dist. Ct.

App. 2021) (quotation omitted); *Prieto v. Smook, Inc.*, 97 So. 3d 916, 917 (Fla. Dist. Ct. App. 2012) (citation omitted). But there is an exception to the general rule: "a promise may be actionable as fraud where it can be shown that the [promisor] had a specific intent not to perform the promise at the time the promise was made." *PVC Windoors, Inc.*, 598 F.3d at 809 n.12 (quotation omitted).

AM contends that summary judgment is warranted on its fraud-in-the-inducement claim because Monroe, from the beginning, misrepresented his ability to complete the building's installation under the timeline set forth in the contract and AM relied on his misrepresentations in entering the contract. Doc. 54 at 23-24. As support, AM points to a number of facts:

- Monroe was "late" in making the $110,000 payment to Akers;

- Monroe failed to meet the construction timeline set forth in the contract;

- Monroe failed to obtain a contractor's license; and

- Monroe sent an email on August 4, 2020, which cancelled the building order he previously had placed with Akers.

*Id.* at 20-24.

Other evidence, however, arguably indicates that Monroe intended—at the time the parties entered the contract—that TCH would perform its obligations under

the contract and that Monroe reasonably believed that TCH had the ability to so perform. This evidence includes the following:

- Before submitting the formal proposal, Monroe solicited bids from various subcontractors;

- Monroe twice traveled to AM's quarry in Marianna, Florida;

- On July 1, 2020, during one of Monroe's trips to Marianna, he met with Haire and other AM employees and inspected the installation site; and

- On July 9, 2020—over a month before the August 15 deadline to perform the contract fully and almost two months before the September 1 "worst case scenario" deadline—Monroe made a $110,000 down payment to Akers for fabrication of the modified metal building.

Doc. 54-1 at 2 lines 3-6; *id.* at 3 lines 4-19; *id.* at 4 lines 5-7, 14-19; Doc. 54-2 at 5 lines 2-11; Doc. 58-1 at 3 lines 15-17; *id.* at 4 lines 7-8; *id.* at 9 lines 9-19.

When considering a motion for summary judgment, all reasonable inferences that can be drawn from this evidence must be drawn in favor of Monroe. *Beard*, 548 U.S. at 529. In light of the record evidence and reasonable inferences drawn from that evidence, there is a genuine dispute whether Monroe submitted the formal proposal to AM without intent or ability to perform. *Witt v. La Gorce Country Club, Inc.*, 35 So. 3d 1033, 1040 (Fla. Dist. Ct. App. 2010) ("Whether a party has made

intentional fraudulent misrepresentations is a question of fact."). Because there is at least one genuine issue of material fact as to AM's fraud-in-the-inducement claim, the District Court should deny AM's motion for summary judgment on this claim.

### 2. *Fraudulent-Misrepresentation and Fraud Claims*

A fraudulent-misrepresentation claim and a fraud claim have similar elements:

1.    a false statement concerning a material fact;

2.    the representor's knowledge that the representation is false;

3.    an intention that the representation induce another to act on it; and

4.    consequent injury by the party acting in reliance on the representation.

*Omnipol, A.S.*, 32 F.4th at 1307 (fraud claim); *In re Harris*, 3 F.4th 1339, 1349 (11th Cir. 2021) (fraudulent-misrepresentation claim); *see Grills v. Philip Morris USA, Inc.*, 645 F. Supp. 2d 1107, 1122-23 (M.D. Fla. 2009) (noting that claims of fraud and fraudulent misrepresentation have "identical elements"). Because the elements of these claims are similar, and AM offers similar allegations and evidence in support of these claims, the undersigned addresses these claims together.

As noted above, a false statement generally must concern a material fact— "past or existing"—not a promise of future performance, unless the "promise of future action is made with no intention of performing or with a positive intention not to perform." *Thor Bear, Inc. v. Crocker Mizner Park, Inc.*, 648 So. 2d 168, 172 (Fla.

Dist. Ct. App. 1994) (citations omitted); *PVC Windoors, Inc.*, 598 F.3d at 809 n.12 (quotation omitted). A party has knowledge that a representation is false if the party made the representation (1) "with actual knowledge of its falsity"; (2) "without knowledge either of its truth or falsity"; or (3) "under circumstances in which the person making it ought to have known, if he did not know, of its falsity." *In re Harris*, 3 F.4th at 1349 (quoting *Joiner v. McCullers*, 28 So. 2d 823, 824 (Fla. 1947)).

In support of its fraud-related claims, AM contends that Monroe made several fraudulent misrepresentations. These include false statements and the act of providing forged documents to AM. Some of Monroe's alleged misrepresentations appear to have induced AM to act to some extent in reliance on those misrepresentations.

Merely demonstrating that a defendant made misrepresentations and that the aggrieved party relied on those misrepresentations, however, is insufficient to warrant summary judgment on a claim of fraud or fraudulent misrepresentation. A plaintiff asserting such claims also must demonstrate that there is no genuine issue of material fact as to *each and every element of these claims*. *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Cntys.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (noting that the moving party must show that there is no genuine issue of material fact as to "all the essential elements of its case"); *ConSeal Int'l Inc. v.*

*Neogen Corp.*, 488 F. Supp. 3d 1257, 1271-72 (S.D. Fla. 2020) (denying summary judgment because the plaintiff failed to show the "absence of any genuine issues of material fact on each essential element of its . . . claim"); *State Farm Mut. Auto. Ins. Co. v. Performance Orthapaedics & Neurosurgery, LLC*, 315 F. Supp. 3d 1291, 1304 (S.D. Fla. 2018) (denying summary judgment because issues of fact remained as to the elements of fraud). As noted above, these elements include the materiality of the alleged misrepresentations and the intent of the person making the misrepresentations.

### (a).    <u>Materiality of the Alleged Misrepresentations</u>

There remain genuine issues as to whether Monroe misrepresented material facts. Under Florida law, a fact is "material" if, "but for the misrepresentation," the aggrieved party would not have acted. *Ribak v. Centex Real Est. Corp.*, 702 So. 2d 1316, 1317 (Fla. Dist. Ct. App. 1997); *Atl. Nat'l Bank of Fla. v. Vest*, 480 So. 2d 1328, 1332 (Fla. Dist. Ct. App. 1985).

For example, AM asserts that on June 22, 2020, Monroe misrepresented that AM's first payment of $154,000 would be used, at least in part, as a down payment to Akers to induce Akers to begin fabricating the metal building that TCH was going to install. Doc. 54 at 17-18, 26-27; Doc. 54-3 at 3 ¶ 11. Despite this alleged misrepresentation, it appears that AM already was obliged under the contract to pay TCH $154,000 within ten days of accepting the formal proposal. Doc. 54-3 at 8-9.

Because AM had agreed to make this payment when it signed the contract on June 8, 2020, it is at least arguable that Monroe's statement—made on June 22, 2020—did not induce AM to make that payment. Doc. 54-1 at 8.

Additionally, the contract did not designate the $154,000 payment, or any portion thereof, as a down payment for fabrication of the building. Instead, the contract designated the $154,000 payment "for mobilization [and] site prep for concrete spread footers." *Id.* Because it appears that under the terms of the contract, AM was going to make the $154,000 payment regardless of what Monroe stated he would do with the funds—and AM's first payment was not designated as a down payment for the building itself—there is a genuine issue whether Monroe's alleged misstatements truly were material

For this reason alone, the District Court should deny AM summary judgment as to its fraudulent-misrepresentation and fraud claims against Monroe.

### (b).    Monroe's Allegedly Fraudulent Intent

The District Court should deny AM's motion for summary judgment as to its fraud-related claims for a second, independent reason: an opposing party's intent rarely can be established without trial testimony, and AM certainly has not established it here.

Because the state of a man's mind often "must be inferred from the things he says or does," establishing intent frequently relies on the use of circumstantial

evidence. *Am. Commc'ns Ass'n, CIO v. Douds*, 339 U.S. 382, 411 (1950); *Smith v. Marcus & Millichap, Inc.*, 991 F.3d 1145, 1157 (11th Cir. 2021); *Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*, 983 F.3d 1273, 1284 (11th Cir. 2020). A defendant's intent, therefore, "turns in large part on the credibility and demeanor of witnesses, and is peculiarly within the province of the jury." *United States v. Erdman*, 953 F.2d 387, 391 (8th Cir. 1992) (quoting *United States v. Long*, 952 F.2d 1520, 1525 (8th Cir. 1991)). Thus, summary judgment rarely is proper for a plaintiff when one of the elements the plaintiff must establish is intent. *King v. Bencie*, 752 F. App'x 881, 884 (11th Cir. 2018) (noting that "summary judgment is generally inappropriate where the underlying issue is one of motivation or intent"); *Glob. Quest, LLC v. Horizon Yachts, Inc.*, 849 F.3d 1022, 1029 (11th Cir. 2017) (noting that summary judgment in fraud cases "is rarely proper as the issue so frequently turns on the axis of the circumstances surrounding the complete transaction, including circumstantial evidence of intent and knowledge").

Monroe apparently has not conceded that he acted with fraudulent intent. Like most other plaintiffs asserting a fraud claim, therefore, AM must resort to circumstantial evidence to establish fraudulent intent. AM likely possesses sufficient circumstantial evidence from which *a jury could infer* that Monroe acted with fraudulent intent, but the evidence is not so one-sided that this is the only conclusion a jury could reach. When the evidence could lead the trier of fact to different

conclusions as to an essential element of a claim, a court cannot take sides in the dispute and grant summary judgment for one party. *See Buending*, 10 F.4th at 1130.

For this reason, too, the District Court should deny AM's motion for summary judgment as to AM's claims against Monroe regarding fraudulent-misrepresentation and fraud.

## IV. CONCLUSION

"As the party seeking summary judgment on a factual issue with respect to which it bears the burden of proof," AM was required "to present evidence so decisive that 'no reasonable jury could find' for" Monroe. *Engineered Tax Servs., Inc. v. Scarpello Consulting, Inc.*, 958 F.3d 1323, 1328-29 (11th Cir. 2020) (quoting *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (quotation omitted)). AM has not done so here. For that reason, the undersigned respectfully **RECOMMENDS** that the District Court:

1.    **DENY** Plaintiff AM's motion for summary judgment. Doc. 54.

2.    Refer this action to the undersigned for further proceedings.

At Pensacola, Florida, this <u>1st</u> day of June, 2022.

/s/ *Michael J. Frank*
**Michael J. Frank**
**United States Magistrate Judge**

**NOTICE TO THE PARTIES**

**The district court referred this case to the undersigned to address preliminary matters and to make recommendations regarding dispositive matters.** ***See*** **N.D. Fla. Loc. R. 72.2;** ***see also*** **28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b). Objections to these proposed findings and recommendations must be filed within fourteen (14) days of the date of the report and recommendation.** <u>**Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.**</u> **An objecting party must serve a copy of its objections upon all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.** ***See*** **11th Cir. Rule 3-1; 28 U.S.C. § 636.**