UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

ALTERNATIVE MATERIALS, LLC,

    Plaintiff,

v.                                                                         Case No. 5:20-cv-239-AW/MJF

TIMOTHY W. MONROE, *et al.*,

    Defendants.
_____/

## REPORT AND RECOMMENDATION

On March 29, 2023, the undersigned conducted an evidentiary hearing to determine the damages stemming from Plaintiff Alternative Materials, LLC's ("AM"), claims of fraudulent misrepresentation and fraud as to Defendant Timothy W. Monroe. For the reasons set forth below, the District Court should enter judgment in favor of AM against Monroe in the amount of $169,935.78, which entails $150,000 in damages and $19,935.78 in prejudgment interest.[1]

### I. BACKGROUND

AM mines and processes agricultural limestone ("aglime") in Marianna, Florida. Doc. 4 at 5–6 ¶ 18. On June 8, 2020, AM contracted with TCH Construction

---

[1] AM no longer seeks punitive damages, costs, or attorney's fees. Doc. 91. Compensatory damages, therefore, are the only damages that remain available to AM. *See* Doc. 4 at 20–21.

Group, Inc. ("TCH"),[2] a corporation of which Monroe is the chief executive officer. *Id.* at 6 ¶ 21. AM agreed to pay TCH $1,540,000 for TCH to install a shed at AM's quarry in Marianna, under which AM could store and dry aglime. *Id.* ¶¶ 20–21.

On June 22, 2020, AM made an initial payment of $154,000 to TCH pursuant to the payment schedule set forth in the contract. *Id.* at 8 ¶ 29. Monroe represented that a portion of the $154,000 would be paid to Akers Building Systems, Inc. ("Akers"), as a down payment on the shed's fabrication. Doc. 54-3 at 3 ¶ 11.

On July 1, 2020, AM and Monroe modified the contract's payment schedule because Monroe fraudulently misrepresented that Akers required an additional down payment of $150,000. Doc. 4 at 8 ¶ 31; Doc. 54-3 at 3 ¶ 13. Based on Monroe's misrepresentation, on July 8, 2020, AM paid $150,000 to TCH. Doc. 4 at 8–9 ¶ 33. Monroe further misrepresented that he transmitted AM's $150,000 payment to Akers for the shed's fabrication. Doc. 54-3 at 4 ¶ 15; Doc. 54-4 at 3 ¶ 12.

The next day, on July 9, 2020, TCH made its first and only payment to Akers in the amount of $110,000. Doc. 54-2 at 5, 7, 11. At some point, Monroe also provided to AM an invoice from Akers and documents indicating that TCH had transmitted money to Akers. Doc. 4 at 10 ¶ 39; Doc. 54-3 at 4–5 ¶ 20. The documents were fraudulent. For example, Monroe altered the invoice from Akers to

---

[2] TCH, a defendant in this action, is in default. Doc. 39. On October 4, 2022, TCH filed for bankruptcy, which automatically stayed all proceedings against TCH until otherwise ordered by the District Court. Doc. 78; *see* Doc. 76.

indicate that Akers was charging $749,554 for the shed, when in fact Akers was charging only $549,554, which entails a difference of $200,000. Monroe also altered the wire transfer receipt to indicate that TCH had paid Akers $150,000 when TCH actually had paid Akers only $110,000, which entails a difference of $40,000. Doc. 54-3 at 5 ¶ 21; *see* Doc. 54-2 at 3, 10–11.

TCH never commenced construction of the shed at the quarry site. In August 2020, AM canceled the contract because it was evident that TCH would not complete the project by the agreed-upon deadline, if ever. Doc. 4 at 12 ¶ 48; Doc. 54-3 at 5 ¶ 24; Doc. 54-4 at 4 ¶ 19.

## II. EVIDENTIARY HEARING AND EXHIBITS

On March 8, 2023, the District Court entered a default judgment against Monroe as to AM's claims of fraudulent misrepresentation and fraud. Doc. 81.The District Court also ordered the undersigned to conduct an evidentiary hearing to determine the damages stemming from those claims. *Id.*

On March 29, 2023, the undesigned conducted an evidentiary hearing. Doc. 87. During the hearing, AM presented the testimony of Charles Rouse, AM's operations manager, only as to AM's lost profits resulting from Monroe's fraudulent conduct. AM previously submitted an exhibit list, a witness list, and proposed findings of fact. Doc. 82. On April 4, 2023, AM supplemented its exhibit list with an affidavit from Rouse and copy of Rouse's calculations of AM's lost profits.

Docs. 88, 88-1. Because Rouse's testimony, affidavit, and calculations overlap significantly, the undersigned addresses them together.

During the hearing, AM's counsel asked Rouse what Rouse's "projections" were "for the material tonnage with the drying shed" when AM "came to Northwest Florida." Rouse testified that the "historical market showed that there were available up to 70, 80 tons per year range [sic] for sales." Rouse did not explain what he meant by the "historical market." Rouse also testified at the hearing that "historically" a company such as AM could sell as much aglime as it could produce.

The entirety of Rouse's calculations is set forth below.

**LOSS PROFIT CALCULATIONS, CHARLES ROUSE, OPERATIONS MANAGER**
**ALTERNATIVE MATERIALS, MARIANA, FLORIDA**

Aglime Sales

| Year | Actual Tons Sold | Revenue per ton | Annual Revenue | Projected Production/Sales in Tons | Projected Revenue | |
|---|---|---|---|---|---|---|
| 2016 | 9,228 | $ 15.00 | $ 138,420.00 | | | |
| 2017 | 18,003 | $ 15.00 | $ 270,045.00 | | | |
| 2018 | 12,848 | $ 15.00 | $ 192,720.00 | | | Drop in tons due to losing shelter during hurricane Micheal |
| 2019 | 4,939 | $ 15.00 | $ 74,085.00 | | | |
| 2020 | 3139 | $ 15.00 | $ 47,085.00 | 25,000 | $ 375,000.00 | Alternative Materials acquired 5/11/20 |
| 2021 | 13,050 | $ 15.00 | $ 195,750.00 | 35,000 | $ 525,000.00 | |
| 2022 | 12,273 | $ 16.00 | $ 196,368.00 | 45,000 | $ 720,000.00 | |
| YTD2023 | 6,856 | $ 17.50 | $ 119,980.00 | 50,000 | $ 875,000.00 | |
| | | | $ 559,183.00 | | $ 2,495,000.00 | |

| | |
|---|---|
| Projected Lost Profits 2020-2023 Due to Lack of Dry Storage | $1,935,817.00 |
| Production Cost of Lost Tonnage | $ (930,000.00) |
| Total Net Loss Profits Due to Lack of Drying Shed | $1,005,817.00 |

Doc. 88-1 at 4. Because Rouse's calculations are ambiguous, three entries warrant further discussion.

First, in the row marked "YTD2023," Rouse indicates that AM's "Projected Production/Sales in Tons" is 50,000 tons. Perhaps Rouse meant that the 50,000-tons projection was for the entirety of 2023, as opposed to only January 1, 2023 to March 29, 2023. Rouse's testimony, affidavit, and calculations fail to specify this, however, and the undersigned is not free to make guesses about what a party intended to communicate through an exhibit.

Second, Rouse's calculations use the term "Projected Lost Profits 2020 – 2023 Due to Lack of Dry Storage." Because Rouse had yet to subtract any expenses when he calculated the $1,935,817, the undersigned below refers to this number as AM's "revenue."

Third, Rouse calculated that AM's production costs for the "lost tonnage" were $930,000. At the evidentiary hearing, Rouse testified that AM expends $6 to produce each ton of aglime. Although it is unclear, it appears that Rouse calculated the "production cost of lost tonnage" as follows: (the quantity of aglime that AM estimates it would have produced between May 2020 and "YTD2023"[3]) x (the cost to produce each ton of aglime). With Rouse's numbers, it appears the calculation would be: 155,000 tons of aglime x $6 per ton = $930,000.

---

[3] It is not clear what Rouse means by "YTD 2023." Of course, the abbreviation "YTD" typically means "year to date."

At the hearing, Rouse testified that AM lost $1,935,817 in "revenue" "mainly" because AM did not have a drying shed during the relevant period. Rouse attributed AM's lack of a drying shed to Monroe's fraudulent conduct. *See* Doc. 88-1 at 1 ¶ 3.

### III. FINDINGS OF FACT

Based on the allegations in AM's complaint, the testimony elicited at the evidentiary hearing, and the documentary evidence provided by AM, the undersigned makes the following factual findings:

1. On June 8, 2020, AM contracted to pay TCH $1,540,000 to install a shed at AM's quarry in Marianna, Florida. Doc. 4 at 2–3 ¶ 4; Doc. 54-3 at 8–9.

2. The contract contained the following payment schedule:

    a. 10% of the total price within ten days of accepting TCH's offer,

    b. 50% of the total price within ten days of TCH arriving at the project site, and

    c. 40% of the total price within 30 days of TCH completing the project. Doc. 54-3 at 8.

3. On June 18, 2020, the parties agreed to modify the shed's dimensions from "200 feet by 400 feet" to "200 feet by 300 feet." The parties also agreed that the shed would now be a "'clear span' building." Doc. 4 at 7–8 ¶ 28.

4. On June 22, 2020, AM paid $154,000 to TCH under the payment schedule. *Id.* at 8 ¶ 29.

5. Monroe represented that a portion of the $154,000 payment would be paid to Akers. Doc. 54-3 at 3 ¶ 11.

6. On July 1, 2020, the parties met at the project site and agreed to modify the schedule for AM's remaining payments to the following:

    a. $150,000 as an additional down payment to Akers,

    b. $450,000 upon completion of the footers, and

    c. $786,000, the remaining balance, upon the project's completion.

Doc. 4 at 8 ¶¶ 30–31; Doc. 54-3 at 3 ¶ 13.

7. The parties modified the payment schedule because Monroe falsely represented that Akers required a second down payment of $150,000. Doc. 4 at 8 ¶ 31; Doc. 54-3 at 3 ¶ 13.

8. On July 8, 2020, AM paid $150,000 to TCH under the amended payment schedule. Doc. 4 at 8–9 ¶ 33; Doc. 54-3 at 3–4 ¶ 14; Doc. 54-5 at 2.

9. But for Monroe's fraudulent misrepresentations, AM would not have paid TCH the $150,000 discussed in the preceding paragraph.

10. Monroe also fraudulently misrepresented to AM that the entire $150,000 payment was paid to Akers for the shed's fabrication. Doc. 54-3 at 4 ¶ 15; Doc. 54-4 at 3 ¶ 12; Doc. 54-2 at 11.

11. On July 9, 2020, TCH paid only $110,000 to Akers. Doc. 54-2 at 5.

12. On July 11, 2020, AM emailed Monroe and expressed its concern that TCH had not yet started constructing the concrete footers. Monroe represented that TCH needed building permits, but that the project would not be delayed. Doc. 4 at 10 ¶ 38.

13. On July 16, 2020, Akers ordered the shed's fabrication. Doc. 54-2 at 7.

14. On July 17, 2020, AM emailed Monroe and again expressed concerns about TCH's ability to complete the project on time. Doc. 4 at 10 ¶ 40.

15. In response, Monroe requested $450,000. AM did not make that payment. *Id.*

16. Sometime afterwards, Monroe sent AM copies of an invoice from Akers and a wire transfer to Akers. Doc. 54-3 at 4–5 ¶ 20.

17. Monroe altered the copy of the Akers invoice he provided to AM as follows:

    a. Monroe increased the shed's total cost by $200,000 from $549,554 to $749,554.

    b. Monroe increased the down payment on the shed by $40,000 from $110,000 to $150,000. *Id.* at 5 ¶ 21; *see* Doc. 54-2 at 3, 10–11.

18. Sometime in August 2020, AM canceled the contract after TCH failed to begin construction at the project site. Doc. 54-3 at 5 ¶ 24.

## IV. Discussion

Absent a factual basis for damages in the record, a federal court must hold a hearing to determine the appropriate damages upon entry of a default judgment. *Anheuser Busch, Inc. v. Philpot*, 317 F.3d 1264, 1266 (11th Cir. 2003); *Adolph Coors Co. v. Movement Against Racism & the Klan*, 777 F.2d 1538, 1543–44 (11th Cir. 1985) ("[A] judgment of default awarding cash damages could not properly be entered 'without a hearing, unless the amount claimed is a liquidated sum or one capable of mathematical calculation.'") (quotation omitted). Indeed, "[a] court has an obligation to assure that there is a legitimate basis for any damage award it enters." *Anheuser Busch, Inc.*, 317 F.3d at 1266; *Pal Env't Servs. v. Trans4Fed LLC*, No. 5:21-cv-184-AW-MJF, 2022 WL 3703947, at *2 (N.D. Fla. July 25, 2022). A party can establish an amount of damages through a hearing or "detailed affidavits." *Adolph Coors Co.*, 777 F.2d at 1544 (quoting *United Artists Corp. v. Freeman*, 605 F.2d 854, 857 (5th Cir. 1979) (per curiam)). A party in default is deemed to have admitted all well-pleaded factual allegations in the complaint. *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015) (quotation omitted).

### A. **AM Is Entitled to Damages for Payments Made in Reliance on Monroe's Fraudulent Representations**

As noted above, the District Court entered a default judgment against Monroe as to AM's claims of fraudulent misrepresentation and fraud. Doc. 81. "[T]o prevail in an action for fraud, a plaintiff must prove its actual loss or injury from acting in

reliance on the false representation." *Morgan Stanley & Co. v. Coleman (Parent) Holdings Inc.*, 955 So. 2d 1124, 1132 (Fla. 4th DCA 2007). In fraudulent-misrepresentation cases under Florida law, "[a]n injured party may recover either the out-of-pocket loss or the benefit of the bargain loss." *Minotty v. Baudo*, 42 So. 3d 824, 835 (Fla. 4th DCA 2010); *Steinbauer Assocs., Inc. v. Smith*, 599 So. 2d 746, 748 (Fla. 3d DCA 1992) ("One measure of damages for fraudulent misrepresentation is the pecuniary loss suffered as a result of the recipient's reliance on the misrepresentation.") (citing RESTATEMENT (SECOND) OF TORTS § 549(1)(B) (AM. L. INST. 1977)).

On July 1, 2020, the parties modified the payment schedule because Monroe misrepresented that Akers required an additional down payment for the shed's fabrication. Doc. 54-3 at 3 ¶ 13; Doc. 54-4 ¶ 10. On July 8, 2020, AM paid $150,000 to TCH under the amended payment schedule, and Monroe misrepresented that he paid all $150,000 to Akers. Doc. 54-3 at 3 ¶ 14; Doc. 54-4 at ¶ 11; Doc. 54-5 at 2. The evidence demonstrates that, but for Monroe's misrepresentations, the parties would not have modified the payment schedule and AM would not have made the $150,000 payment under the amended payment schedule. Based on this information, AM has demonstrated it suffered a loss of $150,000. The District Court, therefore, should award damages in this amount. *See Anheuser Busch, Inc.*, 317 F.3d at 1266; *Pal Env't Servs.*, 2022 WL 3703947, at *2.

B.   <u>**AM Is Not Entitled to Damages for Lost Profits**</u>

AM also requests an award for profits allegedly lost as a consequence of Monroe's fraudulent conduct. "It is settled under Florida law that lost profit damages, like all damages, cannot be speculative and must be proved with reasonable certainty."[4] *Nebula Glass Int'l, Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1213 (11th Cir. 2006) (citations omitted); *Flying Fish Bikes, Inc. v. Giant Bicycle, Inc.*, 181 F. Supp. 3d 957, 967 (M.D. Fla. 2016) (noting that a "party must prove that the lost profits were a direct result of the defendant's actions and that the amount of the lost profits can be established with reasonable certainty") (quotation omitted). Because "proving lost profits invariably includes some element of prediction about how the market would have behaved but for the defendant's tortious act or breach," proving lost profits can be difficult. *Nebula Glass Int'l, Inc.*, 454 F.3d at 1213 (citations omitted). A party seeking to recover lost profits must prove both (1) that

---

[4] Florida courts differ as to whether lost profits are recoverable in a tort action brought pursuant to Florida law. *Compare Kind v. Gittman*, 889 So. 2d 87, 90 (Fla. 4th DCA 2004) ("Lost profits . . . are not the proper measure of damages in a fraudulent misrepresentation case.") (citation omitted); *Martha A. Gottfried, Inc. v. Amster*, 511 So. 2d 595, 599 (Fla. 4th DCA 1987) (same), *with Zinn v. GJPS Lukas, Inc.*, 695 So. 2d 499, 500–01 (Fla. 5th DCA 1997) (holding that lost profits were the appropriate measure of damages in a negligence action); *Douglass Fertilizers & Chem., Inc. v. McClung Landscaping, Inc.*, 459 So. 2d 335, 336 (Fla. 5th DCA 1984) ("It is well established that in both contract and tort actions, lost profits are recoverable . . . ."). Because AM has not carried its burden to demonstrate its entitlement to the amount of lost profits it requests, the District Court need not determine whether Florida law permits such a recovery.

"the defendant's action caused the damage" and (2) that "there is some standard by which the amount of damages may be adequately determined." *Id.* at 1214 (quoting *W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd.*, 545 So. 2d 1348, 1350–51 (Fla. 1989) (per curiam)).

Even assuming that AM has adequately demonstrated that Monroe's fraudulent misrepresentations caused AM to suffer lost profits, AM failed to provide a standard by which its lost profits could be measured. "Damages cannot be based upon speculation or guesswork, but must have some reasonable basis in fact." *Bass Venture Corp. v. Devom, LLC*, 342 So. 3d 821, 824 (Fla. 2d DCA 2022) (quotation omitted). In other words, a court must be satisfied that the requested damages "are not the result of speculation or conjecture." *ICMfg & Assocs., Inc. v. Bare Bd. Grp., Inc.*, 238 So. 3d 326, 336 (Fla. 2d DCA 2017) (quotation omitted).

AM offered Rouse's testimony and calculations to support purported lost profits of $1,005,817. Doc. 88-1 at 4. At the outset, it appears that Rouse's lost-profits calculation is incorrect. Rouse projected that, had TCH built the drying shed as planned, AM would have generated gross revenue of $2,495,000 and would have incurred costs of $930,000 (155,000 tons of aglime x $6 per ton). This would have resulted in a profit of $1,565,000. Using the same $6-per-ton cost—because Rouse's calculations do not provide AM's actual costs for the relevant period—AM had actual revenue of $559,183 and actual costs of $211,908, which results in an actual

profit of $347,275. AM's projected profit ($1,565,000) less AM's actual profit ($347,275) should be $1,217,725, not $1,005,817. This causes the undersigned to question the accuracy of Rouse's calculations.

Additionally, Rouse failed to provide any evidentiary support for many of his assertions. For example, Rouse testified at the hearing that the "historical market" demonstrated that with a drying shed "there were available up to 70, 80 tons per year range [sic] for sales" of aglime produced at AM's Marianna quarry. Rouse provided no evidentiary support for this assertion and failed to define the term "historical market."

Additionally, neither Rouse nor AM's counsel clarified whether Rouse meant what he literally stated (*70 to 80 tons*), or whether he actually meant *70,000 to 80,000 tons*. According to Rouse's calculations, AM produced and sold *more than 25,000 tons* of aglime between 2021 and 2022 alone. *Id.* To the extent Rouse projected that AM would be able to produce and sell *only 70 to 80 tons* of aglime per year, it would appear that Rouse significantly underestimated AM's yearly production and sales of aglime.

On the other hand, to the extent that Rouse meant to say *70,000 to 80,000 tons* of aglime per year, it appears that no entity ever produced from AM's Marianna

quarry more than *18,003 tons* of aglime per year.[5] *Id.* It seems incredible, therefore, that the drying shed would have caused AM to increase its production of aglime by over 61,000 tons (80,000 tons – 18,003 tons = 61,997 tons). Regardless, no plausible interpretation of Rouse's testimony yields a reliable means of calculating lost profits, and AM bears the burden of demonstrating that its calculations "have some reasonable basis in fact." *Bass Venture Corp.*, 342 So. 3d at 824 (quotation omitted).

Furthermore, Rouse did not explain how he calculated AM's projected yearly production and sales of aglime. Rouse merely testified that he "started out at like 25,000 tons . . . [and] then for progress [sic] that annually to ultimately achieve whatever the market demand was." There is no evidence as to what the "market demand" was during the relevant period.

In short, AM's evidence falls woefully short of demonstrating that Rouse's lost-profits calculations have a reasonable basis in fact. To award lost profits, courts require far more support, clarity, and specificity than that which AM provided in this case. *See, e.g.*, *Nebula Glass Int'l, Inc.*, 454 F.3d at 1217–18 (holding that an accounting and valuation expert's detailed calculations, which included calculations based on a historical growth rate, provided an "adequate yardstick" for determining

---

[5] Rouse's calculations indicate that AM began leasing the quarry in May 2020. Doc. 88-1 at 4. Apparently AM's predecessor at the Marianna quarry was responsible for producing 18,003 tons of aglime in 2017. Rouse did not identify the entity that preceded AM at the Marianna quarry.

lost profits); *Flying Fish Bikes, Inc.*, 181 F. Supp. 3d at 968–69 (discussing the materials and methods used to calculate lost profits, including "tax returns," "audited financial statements," and weighted averages); *Armadillo Distrib. Enters., Inc. v. Hai Yun Musical Instruments Mfr. Co.*, 142 F. Supp. 3d 1245, 1258 (M.D. Fla. 2015) (finding that a statement in an affidavit alone was insufficient to establish a lost-profits amount); *Ariz. Chem. Co. v. Mohawk Indus.*, 193 So. 3d 95, 100 (Fla. 1st DCA 2016) (noting that in proving lost profits, a company offered testimony of a director and a forensic accountant, which included references to specific customer accounts, past sales, and market data).

Because AM failed to carry it burden to demonstrate clearly and accurately its purported lost profits, the District Court should deny AM's request for lost profits.

C. **AM Is Entitled to Prejudgment Interest**

Although AM did not make any argument as to prejudgment interest, AM is entitled to such interest as a matter of law. *Argonaut Ins. Co. v. May Plumbing Co.*, 474 So. 2d 212, 215 (Fla. 1985); *accord Millennium Partners, L.P. v. Colmar Storage, LLC*, 494 F.3d 1293, 1304 (11th Cir. 2007); *see Royster Co. v. Union Carbide Corp.*, 737 F.2d 941, 948–49 (11th Cir. 1984) (noting that courts apply Florida's prejudgment-interest statute in diversity actions governed by Florida law). Prejudgment interest is awardable when "there is a pecuniary loss and a date of that

loss." *SEB S.A. v. Sunbeam Corp.*, 148 F. App'x 774, 794 (11th Cir. 2005) (citing *Glover Distrib. Co. v. F.T.D.K., Inc.*, 816 So. 2d 1207, 1213 (Fla. 5th DCA 2002)).

On July 8, 2020, AM paid $150,000 to TCH because Monroe misrepresented to AM that Akers required an additional down payment. Doc. 4 at 8–9 ¶ 33; Doc. 54-3 at 3–4 ¶ 14; Doc. 54-4 at 3 ¶ 11; Doc. 54-5 at 2. Thus, the prejudgment interest amount is calculated from July 8, 2020, based on AM's $150,000 down payment. *Genser v. Reef Condo. Ass'n*, 100 So. 3d 760, 762 (Fla. 4th DCA 2012) ("Courts apply the statutory judgment interest rate from the date of loss or entitlement under section 55.03 for purposes of calculation of pre-judgment interest.") (citing *Argonaut Ins. Co.*, 474 So. 2d at 215); *see* CURRENT JUDGMENT INTEREST RATES, https://www.myfloridacfo.com/division/aa/local-governments/judgement-interest-rates (last visited Apr. 24, 2023). Thus, AM is entitled to $19,935.78 in prejudgment interest, based on the following calculations:

| Date | Annual Interest Rate | Daily Interest Rate | Amount of Judgment | Days | Prejudgment Interest |
|---|---|---|---|---|---|
| 7/8/2020 to 12/31/2020 | 6.03% | 0.000164754 | $150,000 | 176 | $4,349.51 |
| 1/1/2021 to 12/31/21 | 4.81% | 0.000131781 | $150,000 | 365 | $7,215.01 |
| 1/1/2022 to 12/31/22 | 4.25% | 0.000116438 | $150,000 | 365 | $6,374.98 |
| 1/1/2023 to 3/29/23 | 5.52% | 0.000151233 | $150,000 | 88 | $1,996.28 |
| | | | | **Total** | **$19,935.78** |

## V. CONCLUSION

For the reasons set forth above, the undersigned respectfully **RECOMMENDS** that the District Court:

1. **ENTER** judgment in favor of Plaintiff AM against Defendant Timothy W. Monroe in the amount of $169,935.78, representing $150,000 in damages and $19,935.78 in prejudgment interest.

2. **HOLD** that Plaintiff AM is entitled to post-judgment interest under 28 U.S.C. § 1961.

**SO ORDERED** this 24th day of April, 2023.

/s/ *Michael J. Frank*
**Michael J. Frank**
**United States Magistrate Judge**

### NOTICE TO THE PARTIES

**The District Court referred this case to the undersigned to address preliminary matters and to make recommendations regarding dispositive matters.** *See* **N.D. Fla. Loc. R. 72.2;** *see also* **28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b). Objections to these proposed findings and recommendations must be filed within fourteen (14) days of the date of the report and recommendation. Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control. An objecting party must serve a copy of its objections upon all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.** *See* **11th Cir. Rule 3-1; 28 U.S.C. § 636.**